IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | **<u>UNDER SEAL</u>** |
| v. | |
| KOSHA SHARMA | Criminal No. 1:26-MJ-1 |
|     a/k/a "Ma," a/k/a "Mama K," | |
| TARUN SHARMA | |
|     a/k/a "Pop," a/k/a "Pa," | |
| RASHARD PERRISH SMITH, | |
|     a/k/a "Sean/Shawn," a/k/a "B," a/k/a "B-More," a/k/a "Baltimore," | |
| JOSHUA RODERICK, | |
|     a/k/a "Josh," | |
|     *and* | |
| MARGO WALDON PIERCE, | |
|     a/k/a "Marko," | |
|     *Defendants* | |

**AFFIDAVIT IN SUPPORT OF A**
**<u>CRIMINAL COMPLAINT AND ARREST WARRANTS</u>**

I, Lena Highland, being duly sworn, depose and state the following:

**<u>INTRODUCTION</u>**

1.    This affidavit is submitted in support of a criminal complaint and arrest warrants

for Kosha Sharma, a/k/a "Ma," a/k/a "Mama K" (hereinafter, "**KOSHA**"), Tarun Sharma, a/k/a

"Pop," a/k/a "Pa" (hereinafter, "**TARUN**"), Rashard Perrish Smith, a/k/a "Sean/Shawn," a/k/a "B," a/k/a "B-More," a/k/a "Baltimore" (hereinafter, "**SMITH**"), Joshua Roderick, a/k/a "Josh" (hereinafter, "**RODERICK**"), and Margo Waldon Pierce, a/k/a "Marko" (hereinafter, "**PIERCE**").

2.      Based on the information set forth in this affidavit, I submit there is probable cause to believe that from at least in or about February 2024 and continuing up to and including at least in or about December 2025, in the Eastern District of Virginia and elsewhere, **KOSHA, TARUN**, **SMITH, RODERICK,** and **PIERCE** did knowingly and intentionally combine, conspire, confederate and agree with each other and others, known and unknown, to distribute controlled substances, including 400 grams or more of a mixture or substance containing a detectible amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, known as fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since August 2023. As such, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7) empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code. I am assigned to the FBI Washington Field Office, Northern Virginia Safe Streets Task Force. I received training in general law enforcement from the FBI Academy, including training in conducting surveillance, interviews and interrogations, evidence recovery, and source recruitment. I have participated in investigations of gangs and drug-related crimes operating in Virginia, Maryland, and Washington, D.C. I also have participated in investigations involving unlawful narcotics distribution. As part of these investigations, I have interviewed individuals connected with the distribution of narcotics and have obtained information from them regarding the sale, manufacture,

and distribution of controlled substances. I have been involved in the execution of arrests and search warrants for narcotics-related offenses resulting in the prosecution and conviction of individuals and the seizure of illegal drugs, weapons, illegal drug proceeds, and other evidence of criminal activity.

4.      This affidavit is based upon my knowledge of the investigation of **KOSHA, TARUN, SMITH, RODERICK,** and **PIERCE**, as well as other co-conspirators, known and unknown; information provided to me by other FBI agents and law enforcement officials from various other agencies, including the Prince William County Police Department; and my review of documents and information, including official government records, physical surveillance, and other materials and evidence gathered during this investigation.

5.      Because this affidavit is being submitted for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a criminal complaint and arrest warrants, I have not included all facts known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of the proposed criminal complaint and arrest warrants.

## PROBABLE CAUSE

### Overview

6.      Beginning at least in or about May 2023 and continuing up to and including the present, **KOSHA, TARUN**, and Kosha LLC, d/b/a "Red Carpet Inn," have leased and operated a hotel business known as the "Red Carpet Inn" at 17005 Dumfries Road, Dumfries, Virginia 22025. **KOSHA** and **TARUN** are a married couple.

7.      The Red Carpet Inn has been referenced as a known location where one can purchase narcotics and commercial sex. The Red Carpet Inn is also known as a location frequented

by individuals who also frequent "the Jungle," a slang term for an outdoor area of Woodbridge known for high rates of prostitution and drug distribution, which has been relocated several times in recent years.

8.     The Prince William County Police Department ("PWCPD") has observed persistent and pervasive illegal activities—primarily prostitution, drug distribution, violent altercations, and related offenses—at the Red Carpet Inn, as documented by hundreds of police dispatches and reports over the last several years.

9.     According to interviews with multiple patrons of the Red Carpet Inn associated with these illegal activities, the prostitution and drug distribution are localized to the third floor of the hotel and appear to be known to **KOSHA** and **TARUN**. **KOSHA** and **TARUN** closely monitor who comes into and out of the hotel. **KOSHA** and **TARUN** place individuals engaged in illicit activities in the rooms located on the third floor of the hotel; they place other individuals in rooms located on the first and second floors of the hotel. **KOSHA** and **TARUN** also restrict which visitors to the hotel can go to the third floor.

10.     **KOSHA** and **TARUN** take a cut of the profits made from the illegal activity on the third floor of the hotel. According to the patrons of the Red Carpet Inn associated with these illegal activities, **KOSHA** routinely goes from room to room on the third floor of the hotel demanding payment from those engaged in illegal activities. Patrons also report that **KOSHA** and **TARUN** charge approximately $100 per night to rent rooms on the third floor, which is more than the cost for rooms on the first and second floors, with the additional amount being a fee for allowing patrons to work on the third floor and not reporting the drug distribution and prostitution activity to the police.

11.    Based on a review of financial records for the bank account for Kosha LLC from the period ,from in or around May 2023 (when **KOSHA** and **TARUN** began operating the hotel) through the present, **KOSHA** and **TARUN** have used funds they obtained from room rentals, including rentals for illegal activities on the third floor, to pay the monthly lease payment for the property, utilities for the property, and usual day-to-day living expenses.

12.    **SMITH** and **RODERICK** are large-scale narcotics distributors working together in the Northern Virginia region, including out of the Red Carpet Inn, where **SMITH** has been selling drugs since at least February 2024. **PIERCE** is a drug runner for **SMITH** and **RODERICK**. Throughout 2024 and 2025, **RODERICK** and **PIERCE** have resided for extended periods at the Red Carpet Inn, and **SMITH** has frequently visited and stayed at the Red Carpet Inn.

13.    The investigation has focused on a range of illicit activity, including but not limited to drug trafficking and sex trafficking, occurring at the Red Carpet Inn among numerous participants. However, for the limited purposes of this affidavit and proposed criminal complaint, I focus on the conspiracy to distribute controlled substances by **KOSHA, TARUN**, **SMITH, RODERICK,** and **PIERCE**.

**Undercover Operations at the Red Carpet Inn**

14.    Beginning in March 2025, the FBI and PWCPD began conducting undercover operations at the Red Carpet Inn using Undercover Employees (UCEs)[1]. There have been two types of undercover operations at the Red Carpet Inn. First, UCEs have conducted at least nine apparent prostitution encounters. During these operations, UCEs have posed as apparent

---

[1] Numerous UCEs were used throughout the course of this investigation. UCE-1, UCE-2, and UCE-5 are described in this affidavit; UCE-3 and UCE-4 are not described in this affidavit, but they and others were participants in undercover operations conducted during this investigation. For consistency's sake, I have used the UCEs numbers assigned during the investigation.

"prostitutes," "pimps," and "Johns"[2] working at the hotel. Although relevant to the broader investigation, those apparent prostitution encounters are not described in detail in this affidavit. Second, in addition to the apparent prostitution encounters, UCEs have also conducted a total of fifteen controlled purchases of narcotics from individuals at the Red Carpet Inn. Eleven of those controlled purchases have been for fentanyl; four of those controlled purchases have been for cocaine base. In total, law enforcement has acquired approximately 275 grams of fentanyl (including suspected fentanyl) from controlled purchases made with the co-conspirators.

15.    The eleven controlled purchases of fentanyl are set forth in the table below. As noted below, eight of the fentanyl seizures have so far been submitted the Drug Enforcement Administration's Mid-Atlantic Laboratory. Lab results from six submissions have confirmed the presence of fentanyl; lab results from the remaining two submissions to the Drug Enforcement Administration's Mid-Atlantic Laboratory remain pending. All of the seized suspected fentanyl was field tested and tested positive for fentanyl.

---

[2] "Prostitutes" is your affiant's term for women engaged in commercial sex work. "Pimps" is your affiant's term for individuals who direct the prostitutes' activities. "Johns" is your affiant's term for men who pay for commercial sex; the witnesses interviewed as part of the investigation used other terms to describe such men, primarily "dates," "tricks," or "plays."

| Date of Controlled Purchased | Drug Purchased | Drug Quantity |
|---|---|---|
| May 28, 2025 | Fentanyl | .189 grams*[3] |
| June 2, 2025 | Fentanyl | .201 grams* |
| June 18, 2025 | Fentanyl | .735 grams* |
| July 7, 2025 | Fentanyl | 1.533 grams* |
| July 8, 2025 | Fentanyl | 2.22 grams* |
| July 17, 2025 | Fentanyl | 28.12 grams* |
| August 6, 2025 | Suspected Fentanyl | Approximately 36.5 grams^[4] |
| August 21, 2025 | Suspected Fentanyl | Approximately 46.0 grams^ |
| October 10, 2025 | Suspected Fentanyl | Approximately 65.8 grams~[5] |
| November 19, 2025 | Suspected Fentanyl | Approximately 32.7 grams~ |
| December 17, 2025 | Suspected Fentanyl | Approximately 62 grams~ |

16.     For all of the controlled purchases, **PIERCE** handed the narcotics to the UCEs. However, as described in more detail below, during several of the controlled purchases, **PIERCE** briefly left the room on the third floor of the Red Carpet Inn that she was in to obtain the narcotics from elsewhere. Additionally, as described below, there were also multiple conversations among the co-conspirators about the quantities and prices of the narcotics sales made by **PIERCE**.

17.     All of the controlled purchases conducted with **PIERCE** were documented via audio-visual recording devices worn on the person of UCE-1. UCE-1 provided investigators with the purchased narcotics after each operation. UCE-2 remained with UCE-1 for the duration of each operation.

---

[3] An asterisk symbol (*) indicates narcotics that have been tested by the DEA Mid-Atlantic Laboratory.

[4] A caret symbol (^) indicates narcotics that have been submitted to the DEA Mid-Atlantic Laboratory, but results are not yet available.

[5] A tilde symbol (~) indicates narcotics that have been seized but not yet submitted to the DEA Mid-Atlantic Laboratory. These narcotics have been field tested.

18.     Some of the controlled purchases summarized in the table above are described in more detail, below. For the purposes of this affidavit, I have not included detailed information about each and every controlled purchase.

### *April 24, 2025 Operation*

19.     On April 24, 2025, UCE-1, UCE-2 and UCE-5 travelled to the Red Carpet Inn. Prior to their arrival, UCE-1 sent a text message to a phone number associated with **SMITH**. UCE-1 wrote: "Wuts gud, u still servn?" **SMITH** replied by text message: "Who this?" **SMITH** then called UCE-1. **SMITH** said: "Who this?" Before UCE-1 was able to respond, **SMITH** said: "Say don't ever text me, just call my phone. This shit not legal bruh, what the fuck wrong with yall. Call me next time." **SMITH** then hung up the phone.

20.     UCE-1 and UCE-5 arrived at the Red Carpet Inn and walked into the lobby. **TARUN** was sitting behind the front desk. **TARUN** and **KOSHA** were having a conversation about a female while **KOSHA** appeared to be on the phone with the female. **TARUN** said: "Don't say please. Just tell her to leave. If not, call the cops." **TARUN** called over **KOSHA** to assist UCE-1. **KOSHA** provided UCE-1 with a key to Room 322. UCE-1 and UCE-5 utilized Room 322 to facilitate apparent prostitution encounters.

21.     UCE-1 exited Room 322 and identified **RODERICK** coming up the stairs to the third floor of the hotel. Later, while UCE-1 was sitting in the lobby, **TARUN** asked UCE-1: "What room are you waiting for buddy?" UCE-1 responded that he was in Room 322. **TARUN** did not ask any further questions. A male then came down the stairs of the hotel to the hotel lobby and was stopped by **TARUN**, who asked the male if he had a room. The male said "yes," and showed **TARUN** his room key.

22.    As UCE-1 continued to sit in the lobby, UCE-1 observed another male come inside the hotel and inquire with **TARUN** about **RODERICK**. After a short conversation, **TARUN** allowed that male to go upstairs.

23.    A female walked into the hotel and proceeded up the stairs to the third floor. **TARUN** attempted to stop the female, but she continued to walk up the stairs, saying that another individual had told her to come up.  **TARUN** responded: "You've got to call them, honey." **KOSHA** followed the female up the stairs and yelled after the female. **KOSHA** then yelled at other individuals on the third floor that they would be in trouble for helping the female. **KOSHA** stated: "Get out or I'll call the cops right now." **KOSHA** then walked the female downstairs to the lobby. **KOSHA** stated: "If you have it, pay up. If not, then get all of your stuff." The female then exited the hotel. **KOSHA** and **TARUN** then had a conversation in both English and a foreign language, in which they appeared to discuss payment owed to them by the female.

24.    Later, the female reentered the hotel. **KOSHA** yelled: "What are you doing inside?... Out!" **KOSHA** continued to yell after the female: "She owes me money! She's not coming in my building!"

25.    **RODERICK** came down the stairs looking for **KOSHA**. **RODERICK** yelled: "Ma!" UCE-1 then spoke with **RODERICK** in the lobby. The following verbal exchange occurred:

UCE-1:    "I got a little female running some plays she just need some motivation, you know anybody that can hook her up and give her some motion?

**RODERICK**:    Shit, what she was looking for?

UCE-1:    A little fetty[6] if you got it, if that shit good, but whatever the fuck you got, she just need a little motivation.

---

[6] Based on my training, experience, and knowledge of this investigation, I know that "fetty" is a common slang term for fentanyl powder.

**RODERICK**:    I'll see if somebody got it… Somebody got something.

26.     **RODERICK** then returned up the stairs. UCE-1 remained in the lobby. Another female entered the lobby and asked **KOSHA** for a room key. This female said that if she could get a room for about an hour, she would be happy. During this interaction, **KOSHA** appeared to be on the phone and stated: "Hello? Josh?"

27.     The female that **KOSHA** previously yelled at re-entered the lobby and asked UCE-1 to find a particular individual engaged in narcotics distribution located in Room 310 and to "get my cap of down." Based on my training, experience, and knowledge of this investigation, I know that "down" is a common regional slang term for heroin or powdered fentanyl. UCE-1 went upstairs, and knocked on the door of Room 310. An unknown male answered the door and told UCE-1 that the individual he was looking for was not available right now. UCE-1 then went to the lobby, and relayed the message to the female. The female then told UCE-1: "If you talk to Josh, tell him I need to get well." Based on my training, experience, and knowledge of this investigation, I know that "Josh" is a reference to **RODERICK**, and "get well" is common slang term for when a drug addict begins going through withdrawals and needs to use before symptoms worsen.

28.     The UCEs did not purchase any controlled substances during this operation.

***May 28, 2025 Operation***

29.     On May 28, 2025, UCE-1 called a phone number associated with **SMITH**. **SMITH** answered the phone and said: "What's up?" UCE-1 replied: "I've got a bitch that's trying to meet molly, I heard you good for it." **SMITH** responded: "Naw I don't fuck with molly, I don't like that bitch." UCE-1 replied: "Bet, what them other females talking about? Them white girls and fetty?" **SMITH** responded: "Shit dry right now" and then hung up the phone. Based on my training and

experience, I know that "molly" is a common slang term for ecstasy; "white girl" is a common slang term for cocaine; and "fetty" is a common slang term for fentanyl.

30.     UCE-1 and UCE-2 travelled to the Red Carpet Inn. UCE-1 called a phone number associated with **PIERCE**. UCE-1 stated: "My girl trying to get that new fetty wop." **PIERCE** responded: "Aite come over" and stated that she was in "20," which UCE-1 understood to be a reference to Room 320.

31.     UCE-1 and UCE-2 entered the lobby of the Red Carpet Inn and proceeded to the third floor. **KOSHA** called out to UCE-1 and UCE-2 stating: "Can I help you?" UCE-1 told **KOSHA** that they were going upstairs. **KOSHA** did not ask any further questions.

32.     UCE-1 and UCE-2 knocked on the door of Room 320. **PIERCE** answered the door. UCE-1 and **PIERCE** discussed purchasing fentanyl. **PIERCE** advised that she had "tens" and "twenties" available, which UCE-1 understood to be a reference to how much the narcotics would cost. UCE-1 then requested two "tens" and provided **PIERCE** with $20. **PIERCE** advised that she needed to go get the drugs. **PIERCE** left the room and asked UCE-1 to keep the door open. **PIERCE** exited Room 320 and walked in the direction of the stairwell. After a short period of time, **PIERCE** returned with the requested narcotics, namely, a blue powder contained within two clear cone-shaped capsules.

33.     The blue powder substance was submitted to the Drug Enforcement Administration's Mid-Atlantic Laboratory, where the substance tested positive for fentanyl and had a net weight of approximately 0.189 grams.

### *July 7, 2025 Operation*

34.     On July 7, 2025, UCE-1, UCE-2 and UCE-5 travelled to the Red Carpet Inn. UCE-1 observed **TARUN** at the front desk in the hotel lobby and requested a room on the third floor.

**TARUN** stated that he had no rooms available on the third floor. **TARUN** advised that a room would cost $202. UCE-1 told **TARUN** that UCE-1 did not pay that much for a room in the past. **TARUN** became very upset and yelled for **KOSHA** to come to the front desk. **KOSHA** observed that **TARUN** was attempting to put UCE-1 in a room on the second floor of the hotel, and instead **KOSHA** switched UCE-1 to a room on the third floor of the hotel.  UCE-1 paid $202 for the room (to include a $100 deposit which was returned later).

35.    UCE-1 went to Room 320 and knocked on the door. **PIERCE** answered the door and let UCE-1 into Room 320. UCE-1 requested two grams of "fetty". UCE-1 also asked what the price would be for one ounce of "fetty." **PIERCE** advised that she did not know and would have to ask. **PIERCE** left the room and returned with the requested capsules. UCE-1 purchased the twenty capsules from **PIERCE** for $180.

36.    The substance contained in the capsules purchased from **PIERCE** was submitted to the Drug Enforcement Administration's Mid-Atlantic Laboratory, where the substance tested positive for fentanyl and had a net weight of approximately 1.533 grams.

### *July 8, 2025 Operation*

37.    On July 8, 2025, UCE-1, UCE-2, and UCE-5 travelled to the Red Carpet Inn. UCE-1 observed **KOSHA** working the front desk in the hotel lobby. Once inside, UCE-1 and UCE-2 went to Room 320 and knocked on the door, looking for **PIERCE**. There was no answer. While in the hallway, UCE-1 observed **SMITH** knocking on the door of Room 322. UCE-1 asked **SMITH** if **SMITH** had seen **PIERCE**. **SMITH** replied that he had and then began knocking on the door of Room 320. After there was no answer, **SMITH** asked another female in the hallway if "Ma" had "put Marko out." Based on my knowledge of the investigation, I know that "Ma" is an alias for **KOSHA** and "Marko" is an alias for **PIERCE**. UCE-1 told **SMITH** to pass on a message

to **PIERCE** if **SMITH** saw her. UCE-1 told **SMITH** that **PIERCE** had "two gs ready" for UCE-1. A "g" is a common slang term for a gram of narcotics. **SMITH** replied that he would pass on the message, and stated that "Ma" sometimes puts people out.

38.     UCE-1 then asked **SMITH** if anyone else on the third floor of the hotel could provide UCE-1 with narcotics. **SMITH** asked: "What you need?" UCE-1 replied that **PIERCE** was going to provide UCE-1 with powder. **SMITH** then stated: "Oh you need some powder?" UCE-1 observed **SMITH**'s demeanor change; **SMITH** became friendly and introduced himself as "Shawn." **SMITH** stated that he appreciated that UCE-1 was discreet when discussing narcotics. **SMITH** told UCE-1 that **SMITH** needed five minutes and would provide the narcotics as soon as his "man" returned to the Red Carpet Inn.

39.     UCE-1 and UCE-2 went downstairs to the parking lot of the Red Carpet Inn. **RODERICK** then pulled into the parking lot in a gray Acura. **RODERICK** asked UCE-1 and UCE-2 if they were still in the hotel, and said he would see them upstairs if they were. **RODERICK** said he was in Room 315 and entered the hotel.

40.     Given **SMITH**'s statements about waiting for his "man," **RODERICK**'s arrival at the Red Carpet Inn shortly thereafter, and my knowledge that **SMITH** and **RODERICK** are known to work together to distribute narcotics, I understand **SMITH**'s comments about waiting for his "man" to more than likely be a reference to **RODERICK**.

41.     UCE-1 reentered the hotel and went up to the third floor. UCE-1 walked past **SMITH** in the hallway. **SMITH** advised that he was still waiting for his "brother," but began discussing prices of narcotics with UCE-1. UCE-1 advised that **PIERCE** previously discussed selling UCE-1 an ounce of fentanyl. **SMITH** asked UCE-1 how much money UCE-1 was trying to spend; UCE-1 responded: "nothing above $1,200." **SMITH** said: "Aite."

42.    UCE-1 returned to Room 314. **KOSHA** came upstairs to the third floor, appeared very upset, and yelled at individuals in the hallway. **KOSHA** stated that she would "call the cops." **KOSHA** also stated to a female: "There are people outside looking for you."

43.    UCE-1 then answered a knock on the door from **PIERCE**. UCE-1 and **PIERCE** discussed the prices of purchasing one ounce, but then agreed to purchase two grams for that day. **PIERCE** left the room and said she would return. After a short period of time, **PIERCE** returned to Room 314 with two grams of "soft." Based on my training and experience, I know "soft" is a common slang term for powder cocaine. UCE-1 asked **PIERCE** if she still had caps of "fetty powder." **PIERCE** apologized and stated: "You want the same as last time." Based on my knowledge of the investigation, I know this to be a reference to prior purchases of fentanyl made by UCE-1 from **PIERCE**, including the day prior, namely, July 7, 2025. After another short period of time, **PIERCE** returned with the two grams of fentanyl powder wrapped in plastic. UCE-1 provided **PIERCE** with $160 in exchange for the fentanyl powder.

44.    The powder was submitted to the Drug Enforcement Administration's Mid-Atlantic Laboratory, where the substance tested positive for fentanyl and had a net weight of approximately 2.22 grams.

45.    UCE-1 left Room 314 and saw **SMITH** in the lobby. **SMITH** stated: "Y'all wanted some down bruh, I thought y'all wanted some up." UCE-1 replied: "Naw the down." Based on my training and experience, I know "down" is a common slang term for fentanyl, and "up" is a common slang term for cocaine. Based on these statements from **SMITH**, I understand that **SMITH** was aware of the interaction that just previously occurred between UCE-1 and **PIERCE**, during which **PIERCE** first presented UCE-1 with cocaine and then presented him with fentanyl. **SMITH** confirmed with UCE-1 that they should go through **PIERCE** for future purchases.

*July 17, 2025 Operation*

46.    On July 17, 2025, UCE-1 and UCE-2 travelled to the Red Carpet Inn. They went to Room 320, where they encountered **PIERCE**. UCE-1 asked **PIERCE** about the pricing of a "zip" of fentanyl. Based on my training and experience, I know that "zip" is a common slang term for one ounce of narcotics. **PIERCE** responded that she would go find out what the price was for a zip. **PIERCE** then left Room 320. UCE-1 and UCE-2 remained in Room 320.

47.    **PIERCE** returned to Room 320 a short while later and advised that the seller wanted $1,400 for a zip of fentanyl. **PIERCE** advised that the price was high because the area was "hot." Based on my training and experience, I know that "hot" is a common slang term for high police presence. UCE-1 asked **PIERCE** if the seller would be willing to lower the price to $1,200. **PIERCE** advised that the seller was told by the seller's associate not to make a sale that big due to the hotel being "hot." **PIERCE** advised that the seller does his own thing, however, and does not listen to his associate. **PIERCE** also said that UCE-1 had spoken to the associate before. UCE-1 understood these comments to mean that the seller was **RODERICK** and the associate was **SMITH**. As stated above, based on my knowledge of the investigation, I know that **SMITH** and **RODERICK** are known to work together to distribute narcotics. UCE-1 and **SMITH** had also previously discussed prices of narcotics on July 8, 2025, as described above.

48.    UCE-1 advised that if the price would not be lowered, he would only purchase a few grams of narcotics instead. **PIERCE** again left the room. When **PIERCE** returned to the room, she advised that the price of $1,200 was acceptable. **PIERCE** then had UCE-1 come into the bathroom, where she sold UCE-1 one ounce of fentanyl powder.

49.    The powder was submitted to the Drug Enforcement Administration's Mid-Atlantic Laboratory, where the substance tested positive for fentanyl and had a net weight of approximately 28.12 grams.

### *August 21, 2025 Operation*

50.    On August 21, 2025, UCE-1 and UCE-2 returned to the Red Carpet Inn. UCE-1 spoke with **TARUN**, who was working the front desk. **TARUN** asked UCE-1 for identification. UCE-1 paid $100 in cash for a room on the third floor. **TARUN** stated that his wife, **KOSHA**, was out of town and would be back soon.

51.    UCE-1 and UCE-2 went to the third floor of the Red Carpet Inn and knocked on the door of Room 320. **PIERCE** answered the door and invited UCE-1 and UCE-2 inside. **PIERCE** and UCE-1 discussed the purchase of an ounce of fentanyl powder; UCE-1 asked to lower the price from $1,200 to $900.

52.    **PIERCE** left Room 320 and returned several minutes later. **PIERCE** told UCE-1 that **RODERICK** was not going to come to Room 320 to talk with UCE-1 but would agree to sell the ounce of fentanyl for $1,000. There was then a knock on the door. **RODERICK** poked his head into the room and asked to speak with **PIERCE**. **PIERCE** then left the room briefly. When she returned, **PIERCE** advised that **RODERICK** had paid more for this batch of fentanyl and would only drop the price to $1,000.  UCE-1 agreed and purchased the ounce of fentanyl from **PIERCE**.

53.    The substance purchased from **PIERCE** was submitted to the Drug Enforcement Administration's Mid-Atlantic Laboratory, and lab results remain pending. The substance was field tested, and tested positive for fentanyl. The substance had an approximate net weight of 46.0 grams.

54.     UCE-1 left Room 320 and returned to the lobby of the Red Carpet Inn. While in the lobby, UCE-1 was approached by an unidentified male. The unidentified male stated that, while multiple establishments in the area have access to drugs and women, the Red Carpet Inn was the best spot because "the owners know what's going on." Based on my knowledge of the investigation, I understand "the owners" to be a reference to **KOSHA** and **TARUN.**

### Illegal Activity Confirmed by Patrons of the Red Carpet Inn

55.     Since 2024, your Affiant and other federal law enforcement agents have interviewed multiple Red Carpet Inn patrons who were associated with illegal prostitution and/or drug distribution activities on the third floor. Some of the information described by some of these Red Carpet Inn patrons is described below.

56.     Based on my training and experience, I know that an individual fentanyl pill typically weighs approximately 0.1 gram. I also know that an individual "trashcan" style capsule of powdered fentanyl also typically weighs approximately 0.1 gram. Based on the quantities of fentanyl pills described by the Red Carpet Inn patrons, there is probable cause to believe that **KOSHA, TARUN, SMITH, RODERICK,** and **PIERCE** have conspired to distribute more than 400 grams or more of fentanyl.

### *Interview with PATRON-A*

57.     In an April 2025 interview, PATRON-A admitted that he routinely stole merchandise and then sold the stolen clothes in the Woodbridge area. He also routinely passed a few hours of time at the Red Carpet Inn. He never purchased a room at the hotel, but he would sometimes spend a few hours at the hotel with a girl. PATRON-A went to the Red Carpet Inn almost every day.

58.     PATRON-A knew that the "plugs," or narcotics distributors, who operated at the hotel included **RODERICK** and **SMITH**. The "plugs" sold a lot of drugs at the Red Carpet Inn, including fentanyl, crack, "soft," and sometimes marijuana. If you needed anything, you called them first. PATRON-A typically called **RODERICK**, or one of two other individuals, if he wanted narcotics. PATRON-A would tell them what he wanted, and they came downstairs with it. PATRON-A knew that **RODERICK** had his own room on the third floor and lived at the hotel. **RODERICK** and **SMITH** were at the hotel a lot.

59.     PATRON-A bought "crack"; he did not use fentanyl. The most crack PATRON-A bought at once time was one gram. The total price for one gram of crack ranged from $60 to $100 depending on the quality of the product. PATRON-A purchased narcotics from **RODERICK** and **SMITH**.

60.     **RODERICK** had some girls that worked for him. **RODERICK** took the money that the girls made from the girls. A girl once told PATRON-A that **RODERICK** beat one of the girls.

61.     The last time PATRON-A saw **SMITH** was at the Red Carpet Inn. PATRON-A knew **SMITH** to be one of the biggest narcotics dealers in the area.

62.     PATRON-A usually saw whom he referred to as "the owners" of the Red Carpet Inn at the front desk of the hotel. Based on my knowledge of the investigation, I know that "the owners" is a reference to **KOSHA** and **TARUN**, who lease and operate the hotel. PATRON-A believed that **KOSHA** and **TARUN** knew what was going on because patrons had to ask to be let in and tell **KOSHA** and **TARUN** where they were going. **KOSHA** and **TARUN** asked the patrons if they had called the person they were there to visit or directed the patrons to call the person from the lobby.

### *Interview with PATRON-B*

63.     During an August 2025 interview, PATRON-B stated that she recently purchased fentanyl from **SMITH** approximately two weeks earlier, when she was last at the Red Carpet Inn. Typically, when PATRON-B purchased drugs from **SMITH** out of the Red Carpet Inn, **SMITH** would send a girl downstairs to deliver it.

64.     PATRON-B purchased "hard" and fentanyl from **SMITH**. PATRON-B started purchasing from **SMITH** in the summer of 2024 and purchased from **SMITH** every day. PATRON-B spent approximately $100 to $300 per day on "hard" and fentanyl from **SMITH**. The most PATRON-B ever purchased from **SMITH** was for $1,000, when she was middling a deal for someone.

65.     An individual would know if they were purchasing narcotics coming from **SMITH** because they would be in bigger caps, sometimes referred to as "trash cans," for $20. Other people's narcotics would be sold in smaller caps. **SMITH** was willing to make a trade for narcotics. For example, if an individual had stolen goods or a gun, **SMITH** might be willing to take that as a payment. **SMITH** carried firearms. PATRON-B witnessed **SMITH** hit people in the face with a firearm because they stole something from him.

66.     **SMITH** went to Baltimore to pick up drugs. If **SMITH** was not in the area, he was going to pick up drugs in Baltimore. **SMITH** would tell PATRON-B, "I'm going to pick up shit in Baltimore." **SMITH** did not work for anyone; however, plenty of people sold narcotics for **SMITH**. **SMITH** tried not to have too large a quantity of narcotics on him at any given time. Last time PATRON-B purchased narcotics from **SMITH**, **SMITH** had at least 100 caps of fentanyl. Sometimes, **SMITH** had pre-packaged caps of "hard" and sometimes he just broke it off of a large chunk – about a baseball sized amount.

67.    PATRON-B believed that **KOSHA** and **TARUN** both knew what was going on at the hotel because the drug dealers and prostitutes paid them to look the other way. If you were a regular person, you would receive a room on the bottom floors of the hotel. **KOSHA** and **TARUN** were very particular about who walked in.

### Interview with PATRON-C

68.    During an interview in June 2024, PATRON-C reported that it was widely known that the Red Carpet Inn was the site of drug and prostitution activity. PATRON-C stayed at the hotel off and on from approximately June 2023 to June 2024, including for two weeks in approximately May 2024.

69.    **KOSHA** and **TARUN**, a married couple, ran the Red Carpet Inn. Either **KOSHA** or **TARUN** was always in charge at the hotel, 24 hours a day. **KOSHA** knew everything that happened at the hotel. Rooms at the hotel cost $80. Patrons involved in illicit activity would pay $100; the extra $20 was a payment for not telling the police you were there or to receive a warning call when police were present in the area. PATRON-C had received one of these calls from **KOSHA** before.

70.    **KOSHA** collected a cut of whatever sex or drug sales happened at the hotel. **KOSHA** would make the rounds at the hotel to collect money. **KOSHA** would collect money inside the hotel rooms to avoid being captured on camera.

71.    PATRON-C observed that at least eight women sold sex out of the Red Carpet Inn. All of the women working at the hotel worked for a male pimp and PATRON-C was aware of at least five such pimps. These men included **SMITH**, **RODERICK**, Co-Conspirator 1 ("CC-1") and Co-Conspirator 2 ("CC-2"). Prices for the women ranged from $80 to $150. The women

working at the hotel were not free to leave, and drug habits kept them at the hotel working under the men. PATRON-C was aware of the women being beaten up inside the hotel.

72.    CC-1, CC-2 and **SMITH** sold "molly," "crack," and "pills" at the hotel. Each of these three men made about $1,000 each week. Of that, $250 would go to **KOSHA**. One fentanyl pill would sell for $5 to $10, or three for $20.

73.    **SMITH** came and went from the hotel. **SMITH** supplied the fentanyl pills to the hotel and sourced narcotics from Baltimore. PATRON-C believed **SMITH** pressed his own fentanyl pills. PATRON-C witnessed **SMITH** enter a room with blue powder. **SMITH** then offered the powder to PATRON-C, stating, "hit this before I get these joints ready." **SMITH** and CC-1 were always in the same room together.

### *Interview with PATRON-D*

74.    During an interview in August 2024, PATRON-D admitted to regularly purchasing drugs at the Red Carpet Inn. His drug of choice was fentanyl in the form of counterfeit blue M30 pills. PATRON-D's drug addiction was what brought him to the hotels on Old Stage Road; PATRON-D knew that if he went to the hotels, he would find drugs. The area around the hotels was known for easy availability of drugs. PATRON-D started to purchase fentanyl pills from individuals at the Red Carpet Inn, including CC-1 and CC-2.

75.    PATRON-D primarily purchased fentanyl pills from CC-1. Whenever CC-1 was not available, CC-1 would call CC-2. CC-2 would then provide PATRON-D with drugs. CC-1 and CC-2 stayed in the same room. PATRON-D only ever bought fentanyl pills; however, CC-1 offered PATRON-D fentanyl pills, marijuana, cocaine and molly (referred to as "boot.") CC-1 showed PATRON-D the different types of narcotics to prove the quality. When CC-1 pulled out a bag of fentanyl pills, PATRON-D noted there were approximately 1,000 fentanyl pills. CC-1 kept the pills

in the drawers of his room. At times, CC-1 and CC-2 instructed PATRON-D to turn around and face the wall so PATRON-D could not see where CC-1 pulled the bag from.

76.     PATRON-D bought approximately 10 pills a day for several months in the spring of 2024, until CC-1 was arrested. Overall, PATRON-D purchased an estimated 500 pills from CC-1.

77.     When PATRON-D approached the hotel to buy drugs, PATRON-D encountered an "older Indian couple" at the front desk of the hotel. Based on my knowledge of the investigation, I understand this to be a reference to **KOSHA** and **TARUN. KOSHA** and **TARUN** would ask PATRON-D what room he was going to.  Sometimes, **KOSHA** and **TARUN** told PATRON-D that he would have to wait for the person he was meeting with to come down to the lobby to get PATRON-D; other times, they made PATRON-D call the person he was meeting with from the lobby.

78.     PATRON-D observed that CC-1 was close with **KOSHA,** and they would talk often. **KOSHA** would tell CC-1 in front of PATRON-D: "there's too much traffic," or "you're letting too many people in."

### *Interviews with CC-1*

79.     During custodial proffers in October 2024, December 2024, and May 2025, CC-1 described frequenting the Red Carpet Inn. In December 2023, CC-1 met **SMITH** at a 7-Eleven across from the Red Carpet Inn. CC-1 had previously heard of **SMITH**, who was known to sell large quantities of drugs and ran the current "Jungle." **SMITH** operated primarily in Baltimore and Woodbridge.  CC-1 purchased $700 worth of fentanyl pills that day. **SMITH** made CC-1 stay with **SMITH** at a Super 8 hotel nearby and use the pills with **SMITH**. CC-1 stayed in the hotel room at the Super 8 for the next two days and was high during that time. By the time he left, CC-

22

1 had used all of the purchased pills and spent $1,200 total on drugs from **SMITH**. CC-1 then owed **SMITH**. **SMITH** gave CC-1 additional pills and told CC-1 to return with money to pay **SMITH** back. After that, CC-1 started selling drugs for **SMITH**.

80.    At any given time, **SMITH** had 2,000 to 3,000 fentanyl pills on his person. **SMITH** packaged them in different ways. Some were in 10-pack quantities; some were in "k-pack" (or 1,000 pill) quantities.

81.    CC-1 typically purchased 400 to 500 pills at a time, three times a week, from **SMITH**, starting in February or March of 2024, and ending when CC-1 was arrested in May 2024. **SMITH** charged CC-1 between $1,500 and $1,700 for a "k-pack" of pills and always had them on deck, ready to go. CC-1 and **SMITH** communicated by FaceTime. **SMITH** would switch his number every month or so.

82.    **SMITH** sold drugs to everyone. **SMITH** also sold fentanyl pills, meth, marijuana, and cocaine in hotels, trap houses, cars, and in the Jungle.

83.    Several other individuals, including **RODERICK**, also worked for **SMITH**. **RODERICK** operated out of the Jungle and hotels. CC-1 knew about **RODERICK** before CC-1 met **SMITH**. CC-1 knew that **RODERICK** sold drugs. The hotels **RODERICK** operated out of included the Red Carpet Inn.

84.    **SMITH** told CC-1 that **SMITH** was in the prostitution game. CC-1 also observed that **SMITH** rented several rooms in the hotel and that different females went in and out of his room. The women would bring **SMITH** money. **SMITH** would provide the women drugs, including fentanyl pills, crack, molly, and marijuana; **SMITH** would also give them money. CC-1 saw the women walk into rooms with men walking in behind them. When CC-1 spoke to these

women, they told him that they were with **SMITH**, which he understood to mean that if he wanted to sleep with them, he would have to pay **SMITH** first.

85.     CC-1 frequented the Red Carpet Inn from January or February of 2024 through his arrest in May 2024. He stayed at the hotel approximately 3-4 times a week. Approximately six times, CC-1 rented a room himself and was charged $100 each time, which he paid with cash or Apple Pay.

86.     According to CC-1, the owners of the Red Carpet Inn were known as Ma and Pa. Based on my knowledge of the investigation, I understand this to be a reference to **KOSHA** and **TARUN**. **KOSHA** knew the majority of the clients who rented rooms at the hotel. If **KOSHA** believed a client was law abiding, she would place them on one floor and if she believed they were involved in criminal activities, such as narcotics and prostitution, she would place them on a different floor. If a person was not renting a room at the hotel, **KOSHA** would give them 30 minutes to an hour before telling them that they had to leave.

87.     If a customer failed to pay for their room, **KOSHA** would go door to door demanding payment. On one occasion, CC-1 witnessed an unknown female tell **KOSHA** that she would make a payment once she made a "play," meaning sold narcotics or prostitution.

88.     **KOSHA** paid a lot of attention to the security cameras within the hotel so that she would know exactly what was going on in the hotel. **KOSHA** would let police review the surveillance footage if they asked but she would not open hotel room doors for police. And when police came to the hotel, **KOSHA** would tell the occupant who the police were looking for.

## CONCLUSION

89.    Based on the foregoing facts, I submit there is probable cause to believe that **KOSHA, TARUN**, **SMITH, RODERICK,** and **PIERCE** have conspired with each other and others, known and unknown, to distribute controlled substances, including 400 grams or more of a mixture or substance containing a detectible amount of N-phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide, known as fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

Respectfully submitted,

*Lena Highland*

Lena Highland
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to in accordance with Fed. R. Crim. P. 4.1
by telephone on the 8th day of January, 2026.

Digitally signed by Ivan Davis
Date: 2026.01.08 15:43:24 -05'00'

The Honorable Ivan D. Davis
United States Magistrate Judge